# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

JJCK, LLC,                          :
d/b/a EMFINDERS,                    :
                                    :
        Plaintiff,       :
                                    :   Civ. No. 10-930-LPS
     v.                :
                                    :
PROJECT LIFESAVER                   :
INTERNATIONAL,                      :
                                    :
        Defendant.       :

## OPINION

Joseph H. Huston, Jr., Wilmington, DE; Stacey A. Scrivany, Reading, PA, STEVENS & LEE, Attorneys for Plaintiff.

Robert K. Beste, III, SMITH, KATZENSTEIN, & JENKINS LLP, Wilmington, DE; Jonathan D. Frieden, ODIN, FELDMAN, & PITTLEMAN PC, Fairfax, VA, Attorneys for Defendant.

July 1, 2011
Wilmington, DE

*Stark,* U.S. District Judge:

Pending before the Court is Defendant Project Lifesaver International's Motion to

Dismiss Amended Complaint. (D.I. 15) For the reasons that follow, the Court will grant in part

and deny in part this motion.

## I.   **BACKGROUND**

Plaintiff JJCK, LLC ("EmFinders") is a Texas limited liability company that does

business under the name EmFinders.[1] (Am. Compl. (D.I. 10) at 1) EmFinders utilizes cellular

and other technology, called "EmSeeQ," to assist in locating persons with impairments ("PWI"),

such as people who suffer from Alzheimer's or autism, who may have wandered away and

cannot be located. (*Id.* at 2) EmSeeQ functions by having a PWI wear a watch-like device that,

when triggered remotely, will initiate a 9-1-1 telephone call to provide the location of a missing

PWI. (*Id.*)

Defendant Project Lifesaver International ("PLI") is a Virginia non-profit entity that

provides services to various public organizations, governmental agencies, or non-profit agencies

(collectively referred to herein as public service agencies or, simply, "PSAs"). Among other

things, PLI assists PSAs in protecting individuals at risk for wandering by researching and

recommending various search and rescue services, as well as by selling tracking equipment and

services used to locate PWIs who are missing. (Am. Compl. at 2-3) PLI also sometimes assists

in the rescue process.

---

[1]All factual allegations, which for purposes of this motion the Court must accept as true, are taken from the Amended Complaint. *See, e.g., Erickson v. Pardus,* 551 U.S. 89 (2007). Additionally, for clarity's sake, the Court will cite to the Amended Complaint throughout this Opinion as "Am. Compl."

1

PLI had existing arrangements with Proximity RF Systems, a company that, like

EmFinders, provides location services for PWIs. (Am. Compl. at 3) In early 2010, EmFinders

and PLI began exploring the possibility of entering into a joint business arrangement. Under the

terms of the arrangement, EmFinders would pay PLI a monthly fee and, in exchange, PLI would

provide certain services to EmFinders related to the sale, distribution, funding, support, training,

and operation of EmFinders' EmSeeQ location services. (*Id.*) As part of the negotiation process,

PLI extensively tested and evaluated EmSeeQ, including in several successful trials. PLI

determined that the EmFinders system was the preferred technology in the coverage area. (*Id.* at

3-4)

On July 8, 2010, EmFinders and PLI entered into a contract, entitled the "Services

Agreement" ("Services Agreement" or "Agreement"). (Am. Compl. at 4) Article 2 of the

Services Agreement describes "PLI Obligations." (Am. Compl. Ex. A at 3) Specifically, Article

2 provides that PLI agrees to:

> 2.1. Apply its best efforts to promote and maximize
> distribution of the EmSeeQ System in the Coverage
> Area;
>
> 2.2. Provide EmSeeQ services in a prompt,
> professional and workmanlike manner;
>
> 2.3. Employ (directly or indirectly) sufficient
> personnel as reasonably required to meet its
> obligations hereunder;
>
> 2.4. Accurately represent the capabilities of the
> EmSeeQ System;
>
> 2.5. Maintain such records concerning the
> distribution of the EmSeeQ and the provision of
> EmSeeQ Services, which PLI shall furnish

EmFinders from time to time as requested, as may
be necessary to enable EmFinders to comply with
all related requirements imposed under any
applicable federal, state or local laws or regulations;

2.6. Conduct its affairs in an ethical and
businesslike manner, and comply with all applicable
present and future laws, federal, state and local
ordinances and regulations relating to the EmSeeQ
Services; and

2.7. Promptly advise EmFinders of any information
that comes to PLI's attention which may be helpful
to EmFinders, including any complaints or claims of
damage in connection with the EmSeeQ System.

(Am. Compl. Ex A. at 3-4)

The Services Agreement also contains restrictions on PLI's conduct involving other

location service companies.  Article 3 of the Agreement, entitled "Restrictions," provides that

PLI agrees:

3.1.1.  Not to promote, distribute, resell or
otherwise support any GPS or Cellular Based
Location System, other than the EmSeeQ System;

3.1.2.  Not to promote any other location product or
service that provides a similar function as the
EmSeeQ System, including without limitation
Proximity RF Systems, in the Coverage Area, other
than the EmSeeQ System.

3.2.  For the avoidance of doubt, nothing in this
Agreement prohibits PLI from selling, servicing and
supporting Proximity RF Systems in the Coverage
Area where (i) required by a contractual
commitment entered into prior to ther (*sic*) Effective
Date or (ii) where specifically required by the PSA
or Caregiver.

(Am. Compl. Ex. A at 4)

Article 7 provides guidelines for the parties' use of each others' trademarks and brand name. Article 7.3 is entitled "Ownership and Use of Marks and Content." (*Id.* at 5) Article 7.3.4 states that:

> Neither Party will engage in any activity that may be harmful to the other Party's goodwill or may reflect unfavorably on its Marks. This prohibition includes, without limitation, the commission of any unfair trade practice, the publication of any false, misleading or deceptive advertising, or the commission of any fraud or misrepresentation. Each Party agrees that it will not challenge the title or any rights of the other Party in and to its respective Marks during the term of this agreement or thereafter.

(*Id.* at 5-6)

The Services Agreement also contains provisions for terminating the arrangement and for limitations on the parties' liabilities. Article 11, entitled "Term and Termination," provides: "Either party may terminate [the] Agreement immediately by written notice: (a) if the other party commits a non-remediable material breach; or (b) if the other party fails to cure any remediable breach within thirty days after written notice is given to the breaching party." (*Id.* at 7) Additionally, Article 16 limits the liability of the parties. This section, in all caps and bold, provides:

> **16.1 WITH EXCEPTION OF INDEMNITY OBLIGATIONS AND CLAIMS RELATED TO CONFIDENTIALITY HEREUNDER:**
>
> **16.1.1 IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL,**

**SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOSS OF PROFITS, REVENUE, DATA OR USE (WHETHER IN CONTRACT, NEGLIGENCE, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

**16.1.2 WITHOUT LIMITING THE FOREGOING, IN NO EVENT SHALL EMFINDERS AGGREGATE LIABILITY UNDER THIS AGREEMENT FOR ANY DAMAGES FROM ANY CAUSE WHATSOEVER, REGARDLESS OF FORM OR ACTION (WHETHER IN CONTRACT, NEGLIGENCE, TORT OR OTHERWISE) EXCEED THE AMOUNT OF ANNUAL SERVICES FEES OWNED HEREUNDER LESS ANY PORTION ALREADY PAID.**

(*Id.* at 9)

From EmFinders' perspective, the parties experienced problems from the beginning of their arrangement. In July 2010, the same month the parties entered into the Services Agreement, PLI refused to make any formal announcement to any of the PSAs that it serviced. (Am. Compl. at 5) Instead, PLI repeatedly represented to EmFinders that it would begin to actively promote EmFinders' products at PLI's annual convention in early October 2010. Thus, EmFinders made two monthly installment payments under the Services Agreement on July 29, 2010 and August 27, 2010. (*Id.* at 6)

PLI's annual convention occurred during early October 2010. During his opening remarks to the conference, PLI's CEO Gene Saunders did not provide a flattering portrayal of the EmSeeQ System. Instead, Saunders told the convention attendees that it was "not clear" that the

EmSeeQ System would replace "current technology" and advised interested PSAs to "take a serious look" at the EmSeeQ System. (*Id.* at 6) The "current technology" referenced by Saunders was a Proximity RF System, a direct competitor of EmFinders in this market. (*Id.*) From EmFinders' perspective, this negative reference to EmFinders was followed by an enthusiastic endorsement of Proximity RF Systems. PLI also allowed Proximity RF Systems to set up a convention display immediately beside EmFinders' display. (*Id.*) In EmFinders' view, PLI spent the remainder of the convention actively recommending the Proximity RF Systems, while doing little to promote EmFinders' system. PLI apparently offered a price break to any convention attendee that purchased Proximity RF equipment. (*Id.*)

EmFinders also points to other examples, in its view, of PLI's bad faith in executing the Services Agreement. For example, PLI misrepresented the reliability and effectiveness of the EmSeeQ System by providing false or incomplete information about the tests and trial runs of the EmSeeQ System. (Am. Compl. at 7-8) Also, PLI conducted an emergency conference call with its state coordinators during which PLI again misrepresented the reliability and effectiveness of the EmSeeQ System and encouraged its state coordinators not to adopt the EmSeeQ System. (*Id.*) PLI employed only a single person to handle the entire EmSeeQ program nationwide, an insufficient number to deal with PLI's 1,200 member PSAs. (*Id.*) Also, PLI instructed its single employee dedicated to promoting the EmSeeQ System not to forward sales leads to EmFinders. (*Id.* at 8)

EmFinders further points to an agreement with the Lynchburg, Virginia Sheriff's Office that EmFinders submits was terminated because of PLI's misconduct. The Lynchburg Sheriff's Office had agreed to purchase a six-month subscription to the EmSeeQ services from EmFinders.

6

(Am. Compl. at 9)  Just weeks after making the purchase, and after a successful rescue of a

missing child, Lynchburg terminated the EmSeeQ subscription.  Saunders, PLI's CEO, is an

honorary deputy of the Lynchburg Sheriff's Office, and the decision by the Lynchburg Sheriff's

Office to terminate the EmSeeQ arrangement was the direct result of pressure by PLI.  (*Id.*)

PLI's conduct, in EmFinders' view, is directly contrary to the terms and spirit of the

Services Agreement.  As such, EmFinders contends that PLI has breached several provisions of

the Agreement.  Each of these breaches, in EmFinders' view, is non-remediable and, therefore,

cause for immediate termination pursuant to Article 11.2 of the Services Agreement.  (*Id.* at 8)

Accordingly, on October 18, 2010, EmFinders provided PLI with written notice of immediate

termination of the Agreement.  (*Id.*)

EmFinders filed suit in this Court on October 29, 2010, invoking the Court's diversity

jurisdiction.[2]  *See* 28 U.S.C. § 1332 (2006).  In the original complaint, EmFinders sought a

declaratory judgment, as well as relief for breach of contract and "tortious interference with

contract and/or prospective contract."  (Compl. (D.I. 1) at 9-10)  PLI responded on November 24,

2010 by filing a motion to dismiss.  (D.I. 8)  Also that day, PLI  filed a counterclaim against

EmFinders.  (D.I. 9)  On December 13, 2010, EmFinders filed the Amended Complaint.  (D.I.

10)  EmFinders objected to PLI's counterclaim as procedurally improper.  (D.I. 11)

Consequently, PLI voluntarily dismissed the counterclaim and filed a separate lawsuit against

EmFinders for breach of contract based on the same Services Agreement.  (D.I. 13; *see also* Civ.

No. 10-1143-LPS)  PLI filed the instant motion on December 28, 2010, arguing that each of

---

[2]EmFinders alleges, and PLI does not contest, that the parties are diverse of citizenship
and that the amount in controversy exceeds $75,000, as required by statute.  28 U.S.C. § 1332
(2006).

EmFinders' causes of action should be dismissed for failure to state a claim. (D.I. 15) The parties have now fully briefed the motion. (D.I. 16; D.I. 21; D.I. 22) The Court heard oral argument on the motion on May 6, 2011. (D.I. 70) (hereinafter, "Tr.")

## II.  **LEGAL STANDARDS**

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted). Thus, the Court may grant such a motion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks omitted).

However, "[t]o survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007)). While heightened fact pleading is not required, "enough facts to state a claim to relief that is plausible on its face" must be alleged. *Twombly*, 127 S. Ct. at 1974. At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element" of a plaintiff's claim. *Wilkerson v. New Media Technology Charter School Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted). Nor is the Court

obligated to accept as true "bald assertions," *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal quotation marks omitted), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

## III.    DISCUSSION

EmFinders' Amended Complaint raises three claims for relief. Count I seeks a declaratory judgment. Count II is for breach of contract. Count III is for tortious interference with contractual rights and prospective business relationships. PLI seeks dismissal of each of the claims.

### A.    Count I – Declaratory Judgment Claim

In its first cause of action, EmFinders requests a declaratory judgment determining that the Services Agreement was properly terminated by EmFinders' October 18, 2010 written notice. (Am. Compl. at 10) The Declaratory Judgment Act allows a federal court to resolve a dispute between two adverse parties with an "actual controversy." *See* 28 U.S.C. § 2201 (2006).[3] The parties disagree about the necessity of having the Court resolve the dispute over the termination date via a declaratory judgment claim.

PLI contends that EmFinders' declaratory judgment claim is inappropriate because all of the legal and factual issues it presents will necessarily be decided by the parties' competing

---

[3]In relevant part, 28 U.S.C. § 2201(a) provides, "In a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

causes of action, in particular, the breach of contract claims. PLI asserts that courts routinely dismiss declaratory judgment claims when they "add nothing" to an existing lawsuit or when the controversy will be resolved by the disposition of another claim in the case. (D.I. 16 at 8) In such cases, the declaratory judgment claim is "redundant" and, in the interest of judicial economy, the Court is within its powers to dismiss the declaratory judgment claim. (*Id.* at 9)

EmFinders does not quarrel with PLI's characterization of the Court's discretion to dismiss redundant declaratory judgment actions. Instead, EmFinders submits that the only requirement to bring a declaratory judgment action is the existence of a "real and substantial controversy" between two parties that are adverse. (D.I. 21 at 10) According to EmFinders, the existence of the two competing complaints, which involve the same parties and the same Services Agreement, establishes that an actual controversy exists between the two parties. (*Id.* at 11) EmFinders further contends that the alternative causes of action will not necessarily be dispositive of some key issues in the case, including whether EmFinders' termination was valid under the Services Agreement and the date of the termination. (*Id.* at 12)

Under the Declaratory Judgment Act, the decision of whether to resolve cases brought under § 2201 is vested in the Court's discretion. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007) ("The Declaratory Judgment Act provides that a court *may* declare the rights and other legal relations of any interested party, not that it must do so.") (emphasis in original) (internal quotation marks and citations omitted); *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282-83 (1995) (same). A threshold question for pursuing a declaratory judgment action is whether there is an "actual controversy" sufficient to justify the Court's intervention. *See Wyatt v. Gov't of the V.I.*, 385 F.3d 801, 806 (3d Cir. 2004) ("It must be a real and substantial

controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.") (internal citations omitted). The parties do not seriously dispute that there is an actual and substantial controversy at issue in this case. Nor do the parties dispute that this case is ripe. *See Wyatt*, 385 F.3d at 806.

Instead, the crux of the dispute is whether the declaratory judgment action will serve a useful purpose or is, instead, duplicative or redundant. *See Alcoa v. Beazer E.*, 124 F.3d 551, 560 (3d Cir. 1997) ("Although a court has discretion to decline to adjudicate a declaratory judgment action over which it has jurisdiction, a court should *only* exercise such discretion if it determines that issuing a declaratory judgment would serve *no useful purpose*.") (emphasis added and internal citations omitted); *see also* Tr. at 3 ("The issue and the gravamen of the motion to dismiss is whether or not the declaratory judgment action is useful in light of the competing claims that have been alleged in this suit and also the companion suit that was filed . . . .").

Federal Rule of Civil Procedure 57 governs the procedure for obtaining a declaratory judgment. Rule 57 states that "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." The Second Circuit has established the following test for guiding district courts in deciding whether to hear a declaratory judgment action: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from

uncertainty.[4] *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357, 359 (2d Cir. 2003); *see also* Charles Alan Wright, et al., *Federal Practice & Procedure: Civil* § 2759 (3d ed. 1998) (explaining that courts have often quoted this test or a similar one with approval).

The first inquiry considers the utility of allowing the declaratory action to proceed – that is, will the declaratory judgment claim "serve a useful purpose" or is it, on the other hand, "otherwise undesirable." *See Alcoa*, 124 F.3d at 360; *see also United Sweetener USA, Inc. v. Nutrasweet Co.*, 766 F.Supp. 212, 216 (D. Del 1991). Indeed, the Third Circuit has explained that one of the most important principles in deciding whether to exercise discretion is the "practical help, or utility, of that judgment." *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647 (3d Cir. 1990). If the declaratory judgment claim bears "complete identity of factual and legal issues" with another claim being adjudicated by the parties, the Court is within its discretion to dismiss the declaratory judgment action. *See Aldens, Inc. v. Packel*, 524 F.2d 38, 51 (3d Cir. 1975); *see also Teamsters Pension Trust Fund & Vicinity v. Transworld Port & Distrib. Servs., Inc.*, 2010 U.S. Dist. LEXIS 113111, at *7 (D.N.J. Oct. 25, 2010).

In this case, no useful purpose would be served by allowing the declaratory judgment cause of action to proceed. As PLI points out, EmFinders effectively concedes that the termination date is a "crucial issue" that the Court will necessarily need to decide in resolving the parties' contract disputes. (D.I. 21 at 12) The parties have each brought breach of contract claims against one another. By its declaratory judgment claim, EmFinders seeks a declaration that it properly terminated the Services Agreement. This identical issue will necessarily be

---

[4]While the *Dow Jones* case arises in the Second Circuit, the Court nevertheless finds it to be highly instructive – and helpful – in determining the appropriate exercise of its discretion.

decided in resolving the breach of contract claims, and particularly PLI's breach of contract claim against EmFinders in the related action.[5] As the declaratory judgment claim "adds nothing to an existing lawsuit, it need not be permitted." *Regus Mgmt. Group LLC v. Int'l Bus. Mach. Corp.*, 2008 WL 2434245, at *2 (N.D. Tex. June 17, 2008). Accordingly, the Court will grant PLI's motion to dismiss Count I.

## B.    Count II – Breach of Contract

EmFinders' second cause of action seeks relief for PLI's alleged breach of contract. (Am. Compl. at 11) In order to survive a motion to dismiss, EmFinders must set forth sufficient facts to establish the prima facie elements of a breach of contract claim. In Virginia, the elements of a breach of contract claim are: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage caused by the breach of that obligation."[6] *Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 154, 671 S.E.2d 132, 135 (2009). The parties do not seriously dispute that a legally enforceable obligation exists or that EmFinders has suffered an injury. Instead, the central dispute is whether EmFinders has alleged enough facts to establish that PLI's conduct rises to the level of a breach of the Services Agreement.

In this regard, PLI argues that EmFinders has not satisfied the required pleading standard. In PLI's view, EmFinders' breach of contract claim consists of nothing more than "threadbare

---

[5]By separate Order, the Court is today consolidating the instant action with PLI's related action.

[6]As the Court will explain in more detail later in this Opinion, the parties have not clearly set forth their positions on which state's law applies. For argument's sake – and for reasons that will become evident later in the Opinion – the Court applies Virginia law.

recitals of the elements of a claim" and therefore lacks the "necessary particulars" to survive a

motion to dismiss after *Twombly*, 550 U.S. at 556, and *Ashcroft v. Iqbal*, 556 U.S. ___, 129 S.

Ct. 1937, 1949 (2009) (granting motion to dismiss based on "conclusory nature of respondent's

allegations"). (D.I. 16 at 4; *see id.* at 9). Thus, PLI marches through each of EmFinders'

assertions and argues either that EmFinders must point to a specific instance or incident of the

alleged conduct or, alternatively, that the alleged conduct on which EmFinders relies does not

constitute a breach of the Services Agreement. (D.I. 16 at 11) For example, EmFinders avers in

the Amended Complaint that PLI violated Sections 2.4 and 7.3.4 of the Agreement by publicly

disparaging the EmSeeQ System and EmFinders in blog posts, press releases, and statements

issued to its member PSAs. (Am. Compl. at 8) PLI contends that EmFinders must describe the

"specific statements alleged to be false or disparaging" or otherwise provide the necessary factual

basis for this conclusion. (D.I. 16 at 12) Likewise, PLI contends that using fees paid by

EmFinders to support and promote non-EmSeeQ services does not violate Article 2.6 of the

Services Agreement.

For its part, EmFinders submits that PLI's conduct violates several specific provisions of

the Services Agreement and that it has gone well beyond the pleading obligations imposed by the

Federal Rules of Civil Procedure. (D.I. 21 at 12) EmFinders contends that it has pled a litany of

facts, including dates, names, places, and persons. Specifically, EmFinders argues that PLI's

conduct at the annual convention constitutes a breach of Article 2.1 of the Agreement, which

requires PLI to use its best efforts to promote and maximize distribution of the EmSeeQ System.

EmFinders points out that PLI's CEO made statements that it is "not clear that the [EmSeeQ

System] will replace current technology," and then followed these statements with an

enthusiastic endorsement of EmFinders' competitor, Proximity RF Systems. (D.I. 21 at 13)

The Third Circuit has established a two-part test to guide district courts in evaluating a motion to dismiss. *See Edwards v. A.H. Cornell & Son, Inc.*, 610 F.3d 217, 219 (3d Cir. 2010); *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). First, the Court must separate legal and factual conclusions. *See id.* At this step, the Court must accept the well-pled facts contained in the Amended Complaint as true and consider the facts in the light most favorable to EmFinders. *See Spear Pharms., Inc. v. William Blair & Co., LLC*, 610 F.Supp.2d 278, 281 (D. Del. 2009). Next, the Court must determine whether the facts contained in the Amended Complaint could give rise to a plausible claim for relief. *See Fowler*, 578 F.3d at 210.

The Amended Complaint must "raise a reasonable expectation that discovery will reveal evidence supporting the claim." *Spear Pharms*, 610 F.Supp.2d at 283. Even after *Twombly*, plaintiffs are not required to present "detailed factual allegations" in a complaint in order to "cross the line from conceivable to plausible." *Phillips v. County of Allegheny*, 515 F.3d 224, 231-34 (3d Cir. 2008) (internal quotations omitted); *see also Spear Pharms.*, 610 F.Supp.2d at 283. Determining the sufficiency of factual averments will, in the end, be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Fowler*, 578 F.3d at 211 (internal citations omitted).

Applying these principles here, EmFinders' claim for breach of contract does not warrant dismissal. As for the first step of the inquiry, the Amended Complaint contains a host of specific factual allegations, including:

- EmFinders and PLI entered into a Services Agreement on July 8, 2010 that imposed certain obligations on PLI, including that PLI use its "best efforts" to promote and distribute EmSeeQ Systems.

15

(D.I. 10 Ex. A)

- The Services Agreement requires PLI, among other things, to provide services in a prompt, professional, and workmanlike manner; employ sufficient personnel to promote the EmSeeQ System to PLI member-PSAs; accurately represent the capabilities of the EmSeeQ Systems; and refrain from engaging in any activity that would be harmful to EmFinders' goodwill or may reflect unfavorably on EmFinders. (*Id.*)

- PLI refused to announce to its member PSAs that it had entered a business relationship with EmFinders. (D.I. 10 at 6)

- PLI's CEO Gene Saunders disparaged the EmSeeQ System in his opening remarks at the annual convention by discussing the EmSeeQ System with, at the very least, hesitation. (*Id.*)

- PLI accepted payments from EmFinders. (*Id.*)

- PLI made public representations, including on its website, in publications, and in press releases, about the reliability and effectiveness of the EmSeeQ System to member PSAs, including false or incomplete information about the test trials and runs that PLI conducted prior to entering into the Services Agreement. (*Id.* at 7-8)

- PLI instructed its sole employee devoted to the EmSeeQ program not to forward sales leads to EmFinders. (*Id.* at 8)

- PLI continued to promote Proximity RF in the coverage area. (*Id.* at 8)

- PLI's CEO Saunders, who is an honorary deputy in the Lynchburg Sheriff's Office, directly pressured the Sheriff's Office to terminate a subscription for the EmSeeQ System. (*Id.* at 9)

- As a result of PLI's representations regarding the reliability of the EmSeeQ System, two PSAs previously on the verge of purchasing the EmSeeQ System have now backed away. (*Id.* at 10)

Turning to the second step, the Amended Complaint passes muster under the plausibility standard. *See Fowler*, 578 F.3d at 212 (discussing how complaint "need only set forth sufficient

16

facts to support plausible claims"); *Phillips*, 515 F.3d at 233 (noting that providing fair notice to defendant of nature of claims is critical inquiry on motion to dismiss). EmFinders' Amended Complaint cannot fairly be characterized as "threadbare recitals" of the elements of a cause of action, nor does it contain merely conclusory or barebones assertions about the wrongfulness of PLI's conduct. Instead, EmFinders specifically alleges that PLI made false or disparaging statements in press releases to its member PSAs, which would violate Article 7.3.4 of the Services Agreement. EmFinders also alleges that PLI employed only one person to handle the EmSeeQ programs on a national level, not "sufficient personnel" to enable PLI to meet its best efforts obligation, constituting a violation of Article 2.3 of the Agreement. Furthermore, EmFinders alleges that PLI expressly instructed this single employee not to forward potential sales leads to EmFinders, a violation of several provisions of the Agreement, including 2.1, 2.6, and 2.7. EmFinders alleges that PLI has directly, or indirectly through misrepresentations, pressured some of its member-PSAs to refrain from purchasing EmSeeQ Systems. Taken as a whole, there is sufficient factual heft to support a reasonable inference that, at a minimum, PLI did not use its best efforts to promote the EmSeeQ System in contravention of Article 2.1 of the Agreement. EmFinders' Amended Complaint provides PLI fair notice of the nature of the claims against it and of the grounds upon which those claims rest.

In sum, EmFinders' factual allegations give rise to a plausible claim for relief. That is all that is required at the motion to dismiss stage. Accordingly, the Court will deny PLI's motion to dismiss Count II of the complaint.

C.    **Count III – Tortious Interference with Contract and/or Business Expectancy**

In its third claim for relief, EmFinders seeks to recover for PLI's alleged intentional

17

interference with potential or existing contractual relationships between EmFinders and various PSAs across the country, including the Lynchburg, Virginia Sheriff's Office. (D.I. 10 at 12) PLI advances two alternative theories for dismissing EmFinders' claim. First, PLI argues that the Services Agreement contains a limitation of liability clause that forecloses EmFinders' tortious interference claim. (D.I. 16 at 13-14) Second, even if the Agreement itself does not foreclose EmFinders' claim, PLI contends that the complaint fails to establish a prima facie claim for tortious interference under Virginia law.[7] (D.I. 16 at 17) The Court will take up each issue in turn.

### 1.    **Limitation of Liability Provision**

The parties dispute the scope of the liability that the Agreement limits. Article 16 of the Agreement is entitled "Limitation of Liability" and provides that, with the exception of indemnity obligations and claims related to confidentiality,

> **IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOSS OF PROFITS, REVENUE, DATA OR USE (WHETHER IN CONTRACT, NEGLIGENCE, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**

---

[7]PLI argues that, based on Delaware choice of law principles, Virginia law should apply. *See, e.g., New Zealand Kiwifruit Mktg. Bd. v. City of Wilmington*, 825 F.Supp. 1180, 1185 (D. Del. 1993) ("A Federal District Court sitting in diversity must apply the choice-of-law rules of the state in which it sits to determine which state's substantive law governs the controversy before it."). While EmFinders does not concede that Virgina law applies, neither does it dispute its application. (D.I. 21 at 15) The Court, following the example of the parties, will use Virginia law in its analysis.

(D.I. 10 Ex. A at 9)

PLI argues that when the terms of a contract limit liability, they are upheld so long as they were made in good faith, are not unconscionable, and do not fail of their essential purpose.[8] In PLI's view, EmFinders' tortious interference claim is nothing more than a claim for lost profits arising from PLI's alleged breach of the Services Agreement, which is explicitly precluded by Article 16 of the Agreement. (D.I. 22 at 4)

EmFinders responds that the limitation on liability clause is inapposite for two reasons. First, the alleged tort occurred *after* EmFinders had terminated the Services Agreement on October 18, 2010. Thus, it cannot fairly be said to "arise out of" the Agreement as the Agreement was no longer in effect. (D.I. 21 at 14) Second, the basis for the tort – that is, interference with an agreement of the Lynchburg Sheriff's Office to purchase a six-month subscription from EmFinders – is a contract with a third party that is separate from the Services Agreement. According to EmFinders, since the tortious interference claim against PLI is based on the contractual relationship with a third party, it is properly characterized as a tort action that does not seek lost profits "arising out of" the Services Agreement. (*Id.* at 15)

In the Court's view, the liability provision bars EmFinders' tortious interference claim. The liability provision is concededly valid; EmFinders does not argue otherwise. Moreover, it is a broad limitation. Article 16 states that "[i]n no event shall either party be liable to the other party for . . . loss of profits . . . whether in contract, negligence, tort, or otherwise." (D.I. 10 Ex.

---

[8]PLI relies on Delaware law in support of its theory that, as a matter of contract law, the limitation of liability clause is valid and should be enforced. (D.I. 16 at 14) The Services Agreement contains a choice of law provision mandating that it is governed by Delaware law. (D.I. 10 Ex. A at 10)

A at 9) EmFinders acknowledges that the damages it seeks in its tortious interference claim are the type of damages that are covered by Article 16. (Tr. at 24) Additionally, despite EmFinders' protestations to the contrary, the limitation of liability provision survives beyond the termination of the Services Agreement. The Agreement contains a survival provision that contemplates that some obligations and rights under it will survive beyond the termination of the Agreement, including the Article 16 limitation of liability provision.[9]

The only dispute that remains is whether EmFinders' tortious interference claim "arises out of" or "relates to" the Services Agreement. EmFinders submits that since the prospective contracts at issue were between EmFinders and third parties, such as the Lynchburg Sheriff's Office, those prospective contracts do not "arise out of" or "relate to" the Services Agreement. On this point, EmFinders argues that because it was not under a duty to deal exclusively with PLI, EmFinders had access to all of the PSAs as potential clients, completely separate and apart from the Services Agreement; in EmFinders' view, thus, any contract with a third party cannot be said to arise out of or relate to the Services Agreement. (Tr. at 21-23)

The Court disagrees. The parties entered into an Agreement under which PLI would actively promote the EmSeeQ product and services. Instead of doing this, however, PLI did exactly the opposite: disparage the EmSeeQ System and pressure PSAs to avoid using EmFinders' technology. PLI's allegedly tortious conduct, therefore, plainly relates to a subject of the Agreement, i.e., PLI's duties with respect to the EmSeeQ System.

---

[9]Article 19.7 provides: "Survival. Rights and obligations under this Agreement (including any Exhibits) which by their nature should survive, will remain in effect after termination of the Agreement; including, without limitation, Sections 7.3, 7.4, 9, 10, 11, 12, 14, 15, 16, 17, and 19." (D.I. 10 Ex. A at 10)

The Court therefore finds that the Article 16 limitation of liability provision bars EmFinders from asserting a claim for tortious interference with contract rights. Accordingly, the Court will grant PLI's motion to dismiss this claim.[10]

## 2. Tortious Interference under Virginia Law

Because the Court finds that the Services Agreement bars EmFinders' tortious interference claim, the Court need not reach PLI's second argument, involving the sufficiency of EmFinders' allegations under Virginia law.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant PLI's motion to dismiss EmFinders' declaratory judgment and tortious interference with contract rights claims for relief, but deny PLI's motion to dismiss EmFinders' breach of contract claim. An appropriate Order follows.

---

[10]At the oral argument, EmFinders requested leave from the Court to amend its complaint in light of discovery that EmFinders suggests strengthens its tortious interference claim. (Tr. at 19) Because the Court finds that the Article 16 limitation of liability provision covers the types of claims that EmFinders seeks to assert in Count III, any amendment would have no impact on the Court's resolution of the motion to dismiss the claim for tortious interference. Accordingly, EmFinders' request for leave to amend its tortious interference claim is denied.